UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal Number: 06-147 (RBW) |
| | : | |
| v. | : | |
| | : | |
| | : | VIOLATION: 18 U.S.C. §1344(2) |
| **MARK DAVIS-McCRARY,** | : | (Bank Fraud) |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby submits in the above-referenced matter this memorandum in aid of sentencing of defendant Mark Davis-McCrary and motion for a two-level decrease for acceptance of responsibility. As will be discussed below in more detail, the government: (1) moves for a two-level decrease in defendant's offense level because defendant appropriately accepted responsibility; (2) requests that defendant be sentenced to a term of imprisonment at the lower end of the sentencing Guideline range as determined in the Presentence Investigation Report ("PSR"); and, (3) requests that, the Court order defendant to pay restitution of $61,402.61 as stated in the PSR and agreed to by defendant in the plea agreement.

**I. FACTUAL BACKGROUND**

On June 29, 2006, defendant Mark Davis-McCrary pled guilty before the Court to a one-count Indictment charging him with conspiracy to commit bank fraud, in violation of 18 U.S.C. §1344(2) (Bank Fraud).

As agreed to by the defendant and set forth in the Statement of Offense and the PSR, at pages 4-6, from December 1, 1997, to present, the defendant was employed at the Court Services

and Offender Supervision Agency for the District of Columbia ("CSOSA") located at 633 Indiana Avenue, N.W., Washington, D.C. CSOSA maintains the operational responsibilities for the former District of Columbia agencies in charge of probation and parole and houses the Pretrial Services Agency within its framework. From 2004 to present, Davis-McCrary has been employed as a supervisor for probation and parole services at CSOSA. At all times material to the commission of the crime, Davis-McCrary maintained a checking account at the Justice Federal Credit Union ("JFCU") (hereinafter, "JFCU account"). JFCU was a financial institution insured by the Federal Deposit Insurance Corporation.

Between from at least November 2005, to in or about January 2006, in the District of Columbia and elsewhere, defendant knowingly engaged in a scheme to defraud a financial institution, and to obtain money under the custody of a financial institution, by participating in a Nigerian advance fee scam.

On November 2, 2005, Davis-McCrary received an email solicitation at his CSOSA email address from an individual unknown to Davis-McCrary purporting to be a Dr. Raymond Akeem, Managing Director of the Addax & Oryx Petroleum Group, Ltd., ("Addax"). The email requested assistance on behalf of Addax in collecting funds, cashing a check and distributing the proceeds of that check. That same day, Davis-McCrary sent an email from his CSOSA email address to Dr. Akeem in which he agreed to provide the requested assistance. Davis-McCrary also emailed an electronically signed "Letter of Guarantee" to Dr. Akeem. The Letter of Guarantee indicated that Davis-McCrary would receive 10 percent of the check proceeds while the remaining 90 percent would go to Addax.

On December 12, 2005, in the District of Columbia and elsewhere, in order to carry out

the aforementioned scheme and artifice to defraud, defendant deposited a counterfeit check in the amount of $66,775.00 into his JFCU checking account at the Department of Justice ("DOJ") branch located at 950 Pennsylvania Avenue, N.W., in the District of Columbia.  The counterfeit check dated November 28, 2005, was made payable to "Mark Davis-McCrary."  The check purported to be written on the Cascades Transit, Une Division de Cascades Transport, Inc., checking account of Banque Scotia.  Prior to that deposit, Davis-McCrary's JFCU account had a negative balance of $522.44.

The $66,775.00 counterfeit check was provisionally cleared on December 28, 2005, at which time those funds were made available to Davis-McCrary.  Davis-McCrary then made numerous withdrawals from his JFCU account and used the proceeds of the counterfeit check to pay for personal expenses.  In addition, Davis-McCrary made several large cash withdrawals from the JFCU DOJ during January 2006, with a total amount of $31,400. On January 9, 2006, Davis-McCrary withdrew $500 in cash and obtained a $21,000 cashier's check dated January 9, 2006, made payable to an individual with the initials "DD."

In furtherance of the scheme to defraud, Davis-McCrary made a series of wire transfers during January 2006 to various unidentified individuals unknown to Davis-McCrary who were located in England.  Davis-McCrary wired $20,500 of the proceeds of the counterfeit check to individuals located outside the District of Columbia.

On January 17, 2006, the $66,775.00 check Davis-McCrary deposited into his JFCU account on December 12, 2005, was returned counterfeit.  Security personnel at JFCU immediately initiated a fraud investigation and reported the incident to the Federal Bureau of Investigation ("FBI").

On February 7, 2006, defendant Davis-McCrary provided a voluntary written statement to FBI Agents Steven J. Binney and Charles E. Price, II. In that statement, the defendant admitted that he was involved in a Nigerian advance fee scam in the summer of 2005. Davis-McCrary explained that he responded to an email and subsequently received a check of approximately $40,000 which he deposited into an account he held at a SunTrust Bank (SunTrust) branch located in Laurel, Maryland. Davis-McCrary successfully withdrew $4,000 from the proceeds of that check prior to SunTrust's determination that the check was counterfeit. Davis-McCrary admitted to the agents that following that incident, he became more aware of "Nigerian scams" and was educated about them at work. In addition, Davis-McCrary stated that he had done things that he knew were wrong and was "pretty sure" when he deposited the check that it was a scam. Davis-McCrary also admitted that he wired approximately $30,000 to various individuals. Davis-McCrary explained that at some point between December 12, 2005, and January 9, 2006, he conducted an internet search and found numerous references to fraudulent activity associated with the name "Dr. Raymond Akeem." Davis-McCrary admitted that following this search, he was "100 percent sure" he was involved in a scam. Despite this knowledge, Davis-McCrary gave a $21,000 cashiers check he had obtained from the proceeds of the counterfeit check he had deposited into his JFCU account to an acquaintance with the initials "DD." As a result of Davis-McCrary's actions, JFCU suffered an actual loss of $61,402.61.

## II.  UNITED STATES SENTENCING GUIDELINES

The United States Sentencing Guidelines, § 3E1.1, provides for a two-level decrease in a defendant's offense level for acceptance of responsibility and, upon motion of the government,

for a defendant whose level is 16 or greater and who has in a timely manner advised the government of defendant's intent to plead guilty, an additional one-level decrease. Defendant meets the criteria for a two-level decrease and the government hereby moves that the Court grant him a two-level decrease in his offense level for acceptance of responsibility.

The probation officer believes, and the United States concurs, that defendant's total offense level, incorporating the two-level decrease for acceptance of responsibility is 11, his criminal history is I, and his guideline range is 8 to 14 months of imprisonment. PSR, at page 7, ¶¶ 20-33, and page 13, ¶ 71. According to the PSR, defendant falls within Zone C of the Sentencing Table, and the Sentencing Guidelines specify that a sentence of imprisonment, or a sentence of imprisonment that includes a term of supervised release or home detention would satisfy the minimum term of imprisonment required by the guideline range. U.S. Sentencing Guidelines Manual § 5C1.1(d) (Nov. 2005).

### III. IMPACT OF U.S. v. BOOKER ON THE SENTENCING GUIDELINES

There are no facts involved in the calculation of defendant's sentence under the United States Sentencing Guidelines to which defendant did not admit in his guilty plea in this matter. Accordingly, there are no Sixth Amendment concerns in the calculation of his sentence under those Guidelines. However, the Supreme Court has now held that the Sentencing Guidelines are no longer mandatory. Nevertheless, for the reasons set forth below, the government requests that the Court use the Sentencing Guidelines in determining the sentence of defendant in this case.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). In consequence, the

Court invalidated the statutory provision that made the Guidelines mandatory: Title 18, United States Code, § 3553(b)(1). Booker, 125 S. Ct. at 756; United States v. Price, 409 F.3d 436, 442-43 (D.C. Cir. 2005). However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as a benchmark for informing courts as to what would be a reasonable sentence for a particular defendant who has committed a particular crime. The sentence will then be subject to review by courts of appeals for "reasonableness." See Booker, 125 S. Ct. at 766; Price, 409 F.3d at 441, 442.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law in order to calculate correctly a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution is not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C.A. §§ 3553(a)(4)&(5) (Supp. 2004)). See Price, 409 F.3d at 442-43. In light of this mandate, it is plain that a sentence within the Guidelines, while not required, is presumptively reasonable. Not only is a sentence within the Guidelines range presumptively reasonable, it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in Section § 3553(a), such as "the nature and

circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See United States v. Price, 409 F.3d at 442 (listing the factors that guide sentencing).

      Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practices and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Commission, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Every Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity").  Since the Guidelines represent the only extant benchmark to encourage uniformity and thus the only tool to implement the Congressional vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now be reviewed instead for its "reasonableness."  See id. at 766; Price, 409 F.3d at 441, 442.  Nevertheless, the Guidelines – resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. § 3553(a) – provide the most concrete yardstick against which to measure what

would be reasonable.  Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review.  See Section 3553(c) (mandating consideration of the Guidelines); Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reason in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances.  In this case, no unusual circumstances exist that warrant an exception to the preference for Guidelines sentencing.  Therefore, the government respectfully recommends that the Court sentence defendant according to the Guidelines.

### IV.  RECOMMENDATIONS

Defendant pled guilty to one count of bank fraud for his role in a scheme to defraud the JFCU and obtain money under the control of JFCU by participating in a Nigerian advance fee scam.  To execute the fraud, defendant deposited a counterfeit check into his JFCU checking account, made numerous withdrawals from his JFCU account, and used the proceeds of the counterfeit check to pay for personal expenses.  Additionally, in furtherance of the scheme to defraud, defendant made a series of wire transfers to various unidentified individuals.  Defendant's actions caused JFCU to suffer an actual loss of $61,402.61.  This criminal behavior,

with its resulting harm to the JFCU and the members of that financial institution was serious conduct that needs to be adequately punished.  Moreover, beyond the immediate financial losses suffered by JFCU, bank fraud has the associated effect of increasing costs to financial institutions and credit union members.  Unfortunately, bank fraud is a serious and too often recurring matter.

      The actions of the defendant are even more abhorrent given his employment and educational background.  Although he did not act in his official capacity, defendant is a community supervision officer who used government resources to perpetrate the fraud.  Additionally, defendant has bachelor's degree and had been made aware of the criminal nature of Nigerian scams through prior training sessions while employed at CSOSA.  Furthermore, as indicated in the Statement of Offense, which defendant acknowledged as accurate, defendant participated in another Nigerian advance fee scam during in the summer of 2005.  All of these factors heighten the egregiousness of his reprehensible criminal conduct.

      It is also troubling that following his guilty plea, defendant failed to refrain from the unlawful use of a controlled substance, that is, marijuana.  PSR at page 10,  ¶¶ 47-50.  It is particularly troubling that defendant did so while under the supervision of the Court.

      In this case, the government is requesting that the Court grant defendant a two-level decrease for acceptance of responsibility and order that defendant pay restitution.  As discussed above, defendant has appropriately accepted responsibility.  The resulting offense level as set forth in the PSR is 11.  With a criminal history category of I, defendant falls within the sentencing range of 8 to14 months.  The government requests that the Court impose a sentence of imprisonment in the lower end of the sentencing range.  Furthermore, in the plea agreement, at

page 2, ¶ 4, defendant agreed to pay restitution to the victims of his crime. Consistent with the agreement and the determination of the probation officer, the United States requests that the Court order defendant to pay restitution of $61,402.61 to the victims identified in the PSR, at page 15, ¶ 86.

## V. CONCLUSION

WHEREFORE, the government respectfully requests that the Court grant defendant a two-level decrease for acceptance of responsibility, impose a sentence of imprisonment in the lower end of the applicable sentencing range and order defendant to pay restitution in the amount determined in the Presentence Investigation Report.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney

RONALD W. SHARPE
Assistant United States Attorney
Fraud and Public Corruption Section
D.C. Bar No. 434575
555 4th Street, N.W., Room 5828
Washington, D.C. 20530
(202) 353-9460
ronald.sharpe@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served by facsimile and first-class mail on counsel for defendant, Tony Axam, Esquire, Federal Public Defender for the District of Columbia, 625 Indiana Avenue, N.W., Suite 550, Washington, DC 20004, this 22nd day of September 2006.